Christopher L. PHILLIPS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 89–1133.

United States District Court,
D. Idaho.

July 31, 1992.

Walter H. Bithell, Steven B. Andersen, Karl Brooks, Holland & Hart, Boise, Idaho, for plaintiff.

Maurice O. Ellsworth, U.S. Atty., Robert C. Grisham, Asst. U.S. Atty., D. Idaho, Boise, Idaho, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYAN, District Judge.

### I. INTRODUCTION

This non-jury, negligence action was brought by the plaintiff, Christopher L. Phillips, who suffered permanent injuries on June 6, 1985, when the tanker truck he was driving went off Boise National Forest Road 10384, commonly known as "Little Owl Road," near Lowman, Idaho. On May 15, 1989, the plaintiff filed suit against the United States, specifically the United States Forest Service (hereinafter "Forest Service"), and its agents and employees. The plaintiff alleges that the accident occurred because a portion of the road gave way, which forced the truck off the road and into the Crooked River below. The plaintiff claims that the accident was the direct result of negligence on the part of the Forest Service and its employees. This action is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*

Trial commenced on June 2, 1992, and concluded on June 11, 1992. The plaintiff was represented by the law firm of Holland & Hart. The defendant was represented by Robert C. Grisham, Assistant United States Attorney. The parties introduced oral and documentary evidence, and the court has considered and reviewed all pre-trial briefs. The court, being fully advised, makes the following Findings of Fact and Conclusions of Law.

### II. FINDINGS OF FACT

#### A. *Stipulated Factual Issues*

Prior to the trial, the parties stipulated to the following findings of fact:[1]

1. Christopher Phillips was employed by Loomix, Inc., on June 6, 1985, as a truck driver. Before going to work for Loomix, Phillips had been a truck driver for five years.

2. On the date of his truck accident/crash, June 6, 1985, Phillips was working as a contractor's employee on the reconstruction of Boise National Forest Road 10384 ("the road" or "Crooked River Road" or "Little Owl Road").

3. Little Owl Road is a forest development road in the Boise National Forest.

---

1. *See* Stipulation of Agreed Factual and Legal Issues, filed June 5, 1992, at 1–8.

4. The road parallels Edna Creek from State Highway 21 to its confluence with Crooked River at approximately milepost 1. From there, it parallels Crooked River through the accident/crash site.

5. In July of 1981, the Forest Service and Producers Lumber Company entered into a timber sale contract. Little Owl Road provided access to the area in which the logging was to occur. Pursuant to the contract, Producers was, in part, required to "reconstruct" a 6.35 mile stretch of Little Owl Road. The accident site lies within this portion of the road. A copy of the contract was attached as Exhibit A to the stipulation.

6. Producers entered into a contract with Burnett Construction Company, pursuant to which Burnett was to perform the roadwork required under the timber sale contract.

7. Pursuant to the contract, the 6.35 mile stretch of road was to be reconditioned pursuant to Forest Service Standard Specification 306 as amended by the contract, and aggregate was to be placed on that stretch pursuant to Forest Service Standard Specifications 304 and 212. The reconditioning work and the placement of aggregate was accomplished in August of 1984. Copies of these Forest Service Standard Specifications were attached as Exhibit B to the stipulation.

8. The contract also required that a dust palliative be placed upon the 6.35 mile stretch of the road and that the road be bladed prior to the placement of the dust palliative. This work was accomplished in June of 1985, prior to the date of the accident.

9. The Forest Service approved the reconstruction work performed in the area of milepost 5 prior to the date of the accident. No work remained to be done at the accident/crash site near milepost 5. At the time of the accident, the final acceptance inspection had not taken place.

10. Forest Service policy is set forth in the Forest Service Directive System, which consists of Forest Service handbooks and Forest Service manuals. Portions of the Forest Service Manual in effect for the period of time between the drafting of the plans and specifications for the reconstruction and the date of the accident of the accident/crash were attached as Exhibit C of the stipulation. A copy of the Transportation Engineering Handbook in effect for the period of time between the drafting of the plans and specifications and the accident/crash was attached as Exhibit "D" of the stipulation.

11. Copies of the contract daily diaries relating to the reconstruction of the 6.35 mile stretch of road were attached as Exhibit E of the stipulation.

12. At the time of the accident/crash, plaintiff was driving a white cabover Freightliner tanker, tandem-axle tractor unit. The tanker was carrying magnesium chloride.

13. Boise National Forest employees prepared the 1981 Lone Pine contract specifications and its incorporated roadwork drawings.

14. Forest Service employees Dean Carlson, Donald Jankovsky, and Jack Van-Horn worked as inspectors during various phases of the reconstruction of the 6.35 mile stretch of road.

15. The Boise National Forest designated Don Jankovsky as the engineering representative under the contract on October 12, 1984. He, in turn, designated Jack VanHorn as one of his construction inspectors when he left for vacation in late May 1985. In 1984, during the road's reconditioning and surfacing, Dean Carlson carried out the duties of construction inspector.

16. A copy of the Forest Service sign inventory reflecting the signs which were on the road at the time of the accident, was attached as Exhibit F of the stipulation.

17. No signs or warnings existed warning of soft shoulders or soft road surfaces.

18. The principal business of Loomix, Inc., in 1985 was the bulk transportation of liquid fertilizer it manufactured at a plant in Nyssa, Oregon. Loomix dispatched a small fleet of tanker trucks and tractor-tank rigs to haul bulk liquids. It employed

truck drivers, some of whom drove their own rigs and others of whom drove company-owned vehicles.

19. Phillips' first task for Loomix on June 3, 1985, was to drive a 1966 white Freightliner tanker truck from Nyssa to the Crooked River gravel pit. The white tanker truck was loaded with magnesium chloride brine. Loomix and Crazy Bob's were using the gravel pit, situated along the road about two miles from State Highway 21, as the loading point for brine into Crazy Bob's spray truck.

20. From June 3 to June 5, 1985, Phillips hauled brine in bulk from Wendover, Utah, to the gravel pit. Phillips made two round trips from the Crooked River gravel pit to the Great Salt Lake to load brine. On each trip he co-drove a tractor-tanker owned by David Salisbury, another Loomix driver. Returning on the night of June 5 from the second trip, Phillips parked Salisbury's loaded tractor-tanker rig in Idaho City, Idaho.

21. On June 6, 1985, the morning of his accident/crash, Phillips rode with Salisbury in the tractor-tanker to the gravel pit. There, he helped Salisbury and another Loomix employee, James Gerke, transfer the bulk brine from Salisbury's rig to the white Freightliner tanker truck Phillips had ferried to the gravel pit on June 3.

22. At about 1:00 p.m., Phillips headed out of the gravel pit behind the wheel of the Freightliner. He was alone in the truck's cab. He had never driven the road past the gravel pit. He followed Gerke, who was driving some distance ahead in a Loomix pickup. Gerke had told Phillips at the gravel pit that they would drive east up the road toward Little Owl Summit until they encountered the Crazy Bob's spray truck, driven by Robert Geier. Gerke did not know exactly where Geier would rendezvous with their two-truck caravan. As he left the gravel pit behind Gerke, Phillips knew only that he was to drive along the road until they encountered the Crazy Bob's spray truck.

23. Just before 1:30 p.m. on June 6, 1985, Gerke and Phillips had driven about seven miles up the road from the gravel pit. Varying his truck's speed from about 15 mph to about 25 mph, depending on the road's steepness and curvature, Phillips had usually kept Gerke's pickup in sight.

24. Phillips' truck rolled down the slope into the river, coming to rest on the driver's side after a three-quarter roll.

25. As a result of the rollover and accident/crash into Crooked River, Phillips suffered a C4–5 neck fracture.

26. Phillips was pinned in the truck's cab for over two hours with a C4–5 neck fracture. Gerke and Geier assisted in his rescue.

27. Boise County paramedics responded to the accident scene and worked to extract Phillips from the truck. Once removed, he was airlifted out of the Boise National Forest and transported to Saint Alphonsus Regional Medical Center (hereinafter "Saint Alphonsus") in Boise, Idaho. On admission to the emergency room, Phillips was found to be suffering severe hypothermia and CT–scan revealed a C4–5 fracture which resulted in quadriplegia. Phillips was also found to suffer from respiratory insufficiency for which he was treated with tracheostomy and subsequently bronchoscopy. On June 13, 1985, Dr. Patrick Cindrich performed a posterior cervical laminectomy with reduction, wiring and autologous oliac bone graft fusion. Phillips remained in the intensive care unit until June 24, 1985, when he was transferred to the neurosurgery unit. During his stay at Saint Alphonsus, he requested psychiatric counseling to cope with reactive depression.

28. Following discharge from Saint Alphonsus on July 17, 1985, Phillips was transferred to the Idaho Elks Rehabilitation Hospital (hereinafter "the Elks") in Boise. His prognosis upon admission to the Elks was noted as "guarded" by Dr. Leonard Young. During his two-and-one-half-month stay at the Elks, Phillips worked on transfers with a Hoyer lift, development of the ability to operate a power driven wheelchair, and feeding himself. He also learned to operate a speakerphone and to use his feeding splint adapted to enable him to operate a computer. Phillips

was discharged from the Elks on October 26, 1985.

29. In May 1986, Phillips was admitted to Craig Rehabilitation Hospital in Englewood, Colorado, for re-evaluation of his cervical spine injury, a neurogenic bowel and bladder, and mass spasm activity. In September of that year, Phillips began to receive care from Dr. Fred Stark, a family practitioner in Ontario, Oregon, who continues to care for Phillips on an as-needed basis.

30. Phillips was readmitted to the Elks on July 19, 1987, for his annual re-evaluation of his injury and discharged August 10, 1987. During his stay at the Elks, Phillips came under the care of Dr. David Crane, a Boise urologist. Dr. Crane subsequently performed a transurethral resection of the sphincter in September of 1987 to address significant vesicle outlet obstruction due to a spastic external sphincter.

31. During 1988, Phillips was seen by Dr. Robert Friedman of Boise to evaluate a suspected dislocated right hip and continued spasticity, and to determine whether use of a standing table would be beneficial. Phillips continued to be treated by Dr. Stark for recurring urinary tract infections.

32. Phillips was readmitted to the Elks on January 29, 1989, for a one-week comprehensive re-evaluation. During the course of that year, he experienced chronic problems with a spontaneously dislocating hip which kept him bedridden for approximately five months. He was readmitted to the Rehabilitation Institute of Oregon on July 10, 1989, for re-evaluation of his spinal cord injury and examination to determine the etiology of the problems with his hip and resulting radical hemorrhoidectomy with anorectoplasty, renal ultrasound and evaluation for chronic pain management. He was discharged on August 4, 1989.

33. Phillips experienced recurrent urinary tract infections during 1990 and 1991. On October 14, 1991, he was admitted to Emanuel Hospital and Health Center in Portland, Oregon, for re-evaluation of his spinal cord injury. He was evaluated for continuing chronic pain and severe spasticity. Ultrasound revealed asymptomatic cholelithiasis, but no evidence of liver dysfunction was noted. He was discharged on October 26, 1991, and has continued followup care as needed with Dr. Fred Stark in Ontario, Oregon.

34. Phillips currently resides in his own home in Ontario, Oregon, and requires 24–hour attendant care and near maximum assistance for most of his self-care activities. He is able to feed himself, brush his teeth, shave, operate his power-driven wheelchair, and utilize adaptive equipment for telephone and computer operation. He is unable to walk, drive, or participate in any physical activity. He requires assistance in transfers from bed to wheelchair, in bowel and bladder care, in food preparation, and in general household activities. He is unemployable and experiences sexual dysfunction and chronic pain in the buttocks and lower extremities. The conditions described in this paragraph are permanent.

B. *Findings of Fact by the Court*

The court has carefully considered the testimony of all of the witnesses called at trial. In addition, the court has thoroughly reviewed all of the exhibits which were admitted into evidence. Based on this exhaustive and detailed review, the court now enters the following Findings of Fact:

35. On June 6, 1985, Crazy Bob's was "shooting" the road by spraying magnesium chloride (saltwater from the Great Salt Lake) on its surface. Crazy Bob's was working under a subcontract with Burnett Construction, the contractor performing the reconstruction of the road. Crazy Bob's in turn contracted with Loomix, Inc., to obtain saltwater or brine from the Great Salt Lake and to deliver it in bulk to the road.

36. To handle this new business of hauling brine to the road, Loomix hired Christopher Phillips on June 3, 1985. Phillips was a professional truck driver. He had driven a variety of trucks and tractor-trailers for several years before joining Loomix. From 1980 to 1984, he had driven several kinds of

farm equipment and delivery rigs over both paved and dirt roads, including dirt roads through farms and ranches, along canals, and up mountains.

37. After leaving the gravel pit on the day of the crash, Phillips followed fellow employee James Gerke up the road to the rendezvous with Crazy Bob's spray truck. Gerke was not piloting Phillips or blocking traffic for him.

38. When Phillips' truck crashed, the road was under the complete control of the Forest Service. The Forest Service ordered the road closed to the public on June 6, 1985, to afford greater safety for construction traffic. Despite the order closing the road on May 28, 1985, both James Gerke and Phillips noted signs of recent logging and public traffic on the road. Phillips therefore expected that, on his trip up the road to meet Crazy Bob's spray truck, he would have to observe normal truck-driving precautions by keeping to the right of the road in order to avoid oncoming traffic. In addition, prior to starting up the road on June 6, 1985, Phillips had observed a Forest Service regulatory sign instructing traffic to "keep right," which was placed on the road at some point before the gravel pit.

39. As Phillips approached the left-hand curve in the road where the accident occurred, he positioned his truck where a prudent, careful and experienced professional truck driver would have positioned the truck. The testimony of numerous witnesses who viewed the accident scene, including Boise County Sheriff Deputy Lee Marl Blough, who was the first law enforcement investigator on the scene, clearly established that the right tires of the plaintiff's truck were at least one and one-half and as much as two feet from the edge of the road. The photographic evidence produced at trial also clearly showed that the tire tracks left by the truck were on the travelled portion of the road.

40. The court specifically finds that Phillips' truck was *at all times* on the roadway as it approached the left-hand curve. The truck was properly placed on the roadway at all times up to the point when it encountered a soft portion of the road, which had not been properly compacted according to the contract specifications after the reconstruction work had been done, and which sucked and sunk the truck's tires down into and below the road's surface, altering the position and alignment of the truck.

The testimony of witnesses at the scene on the day of the accident established that the tires left a deep track in the road—8 to 10 inches in depth. Deputy Sheriff Blough measured the track compression. At its deepest point, where the truck finally left the roadway, the tires had sunk to a depth of 17½ inches, and he could see marks in the ground left by the truck's front axle. This extremely soft area in the roadway caused the truck to tip to the right, which in turn caused it to roll down the embankment and into the river below.

41. The testimony and photographic evidence produced at trial clearly established that the truck never left the roadway until it rolled over the edge of the slope. Phillips did not drive off the road. Rather, the soft portion forced the truck towards the edge of the road, causing it to collapse and forcing the truck off the road. Forest Service regulations and standard specifications, and the Lone Pine Timber Sale Contract required the *entire* width of the roadway, from edge to edge, to be compacted to specified densities to enable vehicles such as the truck driven by Phillips to travel safely. Specifications 304 and 306 of the Forest Service Standard Specifications incorporated into the contract required the contractors to compact the road with compaction equipment to its full width.

42. Phillips attempted to escape this very soft portion of the road by steering to the left and downshifting. His description of the truck's behavior during the crash was an accurate account of the truck's right tire being "sucked into" the road. Phillips was unable to steer to the left out of the soft portion of the road because the right front tire sank down into the road so far that it could not climb up over the road surface immediately adjacent to the soft area.

43. Phillips attempted to escape the very soft portion of the road in a timely, safe and appropriate manner by steering to the left and downshifting. He travelled at all times at a reasonable and safe speed for the apparent conditions of the road. Phillips had adequate time to try to steer to the left and to downshift. Phillips did *not* drive off the road through inattention or distraction. He was well rested and skillful at driving trucks on dirt and gravel roads.

44. The portion of the road which caused the accident was too soft to support Phillips' truck because the road was not properly compacted during its reconstruction by Forest Service contractors. The road's softness sucked Phillips' truck down and toward the road's edge, which in turn caused a portion of the roadway to collapse. These conditions clearly demonstrated a violation of Forest Service compaction standards set out in the Lone Pine Timber Sale Contract and described in Forest Service Standard Specifications 212, 304, and 306. The contractors performing the reconstruction work were required to comply with these mandatory specifications. The violation of these specifications resulted in the soft area and also caused a portion of the road to collapse.

45. The Forest Service failed to require the contractors to use road compaction equipment and testing methods required by the Forest Service Standard Specifications and the timber sale contract. The failure of the Forest Service to require compliance with the specifications caused the road at milepost 5 to be unsafe on June 6, 1985. The Forest Service was required to ensure that the contractors complied with the mandatory road compaction specifications. The Forest Service inspectors could have and should have detected the very soft portion of the road caused by the contractors' failure to comply with the compaction specifications. The unsafe portion of the road was ignored by the Forest Service construction inspectors. The evidence presented at trial also clearly established that the slope adjacent to this portion of the road was not overly steep, and the soft area could have been removed or brought up to required standards of hardness and strength to the very edge of the road without unreasonable cost or effort.

46. The testimony and documentary evidence produced at trial established that the road should have been capable of supporting Phillips' truck within one to two feet from the edge of the road. The evidence showed that the road is capable of holding traffic in that position today, and it should have done so on June 6, 1985.

47. Forest Service regulations and the timber sale contract required the Boise National Forest to ensure that the contractors complied with the mandatory road compaction specifications. The Boise National Forest employed three or more road construction inspectors in 1984 and 1985 whose duty was to ensure that the contractors reconstructed the road according to the specifications. Various other Boise National Forest officials, engineers, and technicians were to ensure that the road was properly compacted and otherwise safe for traffic. The inspectors could have and should have detected the soft portion of the road which caused the accident, had they followed Forest Service regulations and performed the required inspections. The testimony of the inspectors at trial, as well as the daily construction diaries of the reconstruction work, clearly established that *no meaningful inspections were ever performed by any of the Forest Service inspectors.*

48. The timber sale contract and the Forest Service road building regulations required the Boise National Forest to inspect the reconstruction work regularly and carefully to ensure all work complied with the contract. Proper inspections were to serve two important purposes: (1) ensure the safety of drivers who would use the road; and (2) verify satisfactory completion of the work before authorizing payment.

49. As noted above, none of the designated inspectors ever adequately performed their required inspection duties. This failure to inspect was a direct cause of Phillips' accident. Had the inspectors met

their duty to inspect, Phillips' accident and resulting injuries could have been prevented.

50. The Forest Service was responsible for giving written approval of the subgrade prior to placing the aggregate base or surface course. J.R. Stewart Co. never received written approval from the designated inspector before laying the aggregate over the reconditioned roadbed in August–September of 1984. The Boise National Forest Inspectors were to ensure that J.R. Stewart Co. knew the method for checking for quality compaction and gradation. No evidence indicates that the Forest Service inspector ever explained his proposed aggregate testing methods or in fact followed any recognized methods. Had he done so, the faulty compaction at milepost 5 would have been detected and cured.

The Boise National Forest permitted the contractors to breach contractual specifications requiring compaction of the road to stated minimum standards of density and strength. The Boise National Forest selected those specifications—Standard Specification 306/Compaction Method A, Standard Specification 304/Compaction Method B, Standard Specification 212/Required Compaction Equipment. The Forest Service inspectors were required to inspect the work done by the contractors to ensure that the work met these specifications. The contract and Forest Service regulations emphasized that no deviation from compliance with the specifications was permitted unless expressly authorized in writing. Yet, the Forest Service did nothing to ensure that the specifications were met.

51. The purpose of the compaction required by the specifications was to ensure that the road was safe for vehicular travel. The failure of the Forest Service to inspect and verify that proper compaction had taken place presented a foreseeable risk that the road would give way beneath traffic which the Forest Service knew would be on the road.

52. The Forest Service's negligent failure to inspect the road and to detect the improperly compacted portion of the road at milepost 5 was a proximate cause of Phillips' accident and resulting injuries.

53. As a result of the accident, Phillips sustained numerous severe injuries, the gravest being a fracture of his cervical spine with attendant spinal cord damage. This fracture has caused permanent quadriplegia and associated physical and psychological damages. Phillips also experiences chronic pain. The evidence presented to the court credibly described Phillips' injuries and the efforts of his treating physicians to stabilize his condition and permit him some prospect of a meaningful life.

54. As a result of his spinal cord injuries caused by the crash, Phillips will never work again.

55. The evidence presented at trial through the testimony of James Evenson, an economist, and John Dahlberg, a rehabilitation consultant, set forth Phillips' lost past and future earnings, past medical and related expenses, and future medical and necessary support expenses in a reasonable and persuasive manner. The court finds the figures put forth by both Evenson and Dahlberg to be accurate and conservative.

56. The court also finds the approach of computing the present value of future lost wages and future medical and related expenses offered by James Evenson to be more credible and reasonable than that offered by the defendants' economist, Ronald Dulaney.

57. The court further finds the testimony and evidence offered by the defendant's expert, Dennis Maupin, who is also a rehabilitation consultant, to be completely without proper foundation and seemingly based entirely on speculation and conjecture. Maupin never met with Phillips to discuss what his needs are or will be in the future. Maupin never visited Phillips' home to see what changes might be needed. And, Maupin never talked with any of Phillips' treating physicians. Therefore, the court finds that Maupin's report was not adequately researched, and the court concludes that it cannot rely on anything offered by this witness.

58. To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are incorporated into these Findings of Fact.

## III. CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

### A. *Stipulated Conclusions of Law*

Prior to the trial, the parties stipulated to the following conclusions of law:[2]

2. Phillips sues the United States Forest Service under the Federal Tort Claims Act (FTCA). The FTCA authorizes suits for damages against the United States for

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.S. § 1346(b) (Law.Co-op.1988). In Phillips' suit, the United States would be liable in the same manner and to the same extent as a private person in Idaho under like circumstances. 28 U.S.C. § 2674.

■ 3. Phillips was on the road June 6, 1985, as an invitee of the Boise National Forest. "The general rule in Idaho was stated in *Otts v. Brough*, 90 Idaho 124, 409 P.2d 95 (1965), that owners of property owe to an invitee the duty to keep the premises in a reasonably safe condition or to warn the invitee of hidden or concealed dangers." *Bates v. Eastern Idaho Regional Medical Center*, 114 Idaho 252, 253, 755 P.2d 1290, 1291 (1988).

4. In *Harrison v. Taylor*, 115 Idaho 588, 768 P.2d 1321 (1989), the Idaho Supreme Court "simplif[ied] the standard of care applicable to both owners and occupiers of land—and to the invitees who come upon the premises." *Id.* at 591, 768 P.2d at 1324. *Harrison* declared the negligence

standard that will govern this court's consideration of Phillips' claim against the Forest Service: "Henceforward, owners and occupiers of land will be under a duty of ordinary care under the circumstances towards invitees who come upon their premises." *Id.* at 595, 768 P.2d at 1328.

■ 5. Relying on the comparative negligence statute passed by the Legislature in 1971, Idaho Code § 6–801, *Harrison* announced the test for comparing an invitee's claim of premises liability against the owner's duty of ordinary care: "The jury [here, the court] will compare the owner or occupier of land's behavior versus that of the invitees who come upon the premises. Disputes in this area will normally present a jury question under particular facts, unless reasonable minds could not differ." *Harrison v. Taylor*, 115 Idaho at 596, 768 P.2d at 1329 (citation omitted). The factfinder will thus decide "whether the injured party knew, or should have known of the danger, the obviousness of the danger, whether there was a justifiable reason for confronting the danger, and so on." *Id.* at 595, 768 P.2d at 1328.

6. The Idaho Supreme Court has applied *Harrison* retroactively to claims arising after the 1971 enactment of the comparative negligence statute, but before the date of *Harrison*, which was decided in January of 1989. *See Baker v. Shavers, Inc.*, 117 Idaho 696, 791 P.2d 1275 (1990); *Arrington v. Arrington Bros. Constr., Inc.*, 116 Idaho 887, 781 P.2d 224 (1989). The Forest Service, therefore, owed Phillips a duty of ordinary care on June 6, 1985, the date of his accident/crash on the road.

■ 7. Negligence involves foreseeability of injury, duty on the part of the defendant, and breach of the duty, and the breach must bear a causal relationship to the injury. *Johnson v. Stanger*, 95 Idaho 408, 510 P.2d 303 (1973). Foreseeability is a flexible concept which varies with the circumstances of each case. Where the degree of result or harm is great, but preventing it is not difficult, a relatively low

**2.** *See* Stipulation of Agreed Factual and Legal Issues, filed June 5, 1992, at 9–11.

degree of foreseeability is required. Conversely, where the threatened injury is minor, but the burden of preventing such injury is high, a higher degree of foreseeability may be required. Thus, foreseeability is not to be measured by just what is more probable than not, but also includes whatever result is likely enough in the setting of modern life that a reasonably prudent person would take such into account in guiding reasonable conduct. *Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 796 P.2d 506 (1990).

■ 8. Proximate cause in the sense of cause in fact embraces two closely related elements. First, an event is cause in fact of a succeeding event only if the succeeding event would not have occurred "but for" a prior event, and thus, an act or omission is not the cause in fact of ensuing damage if the damage likely would have occurred anyway. The second element requires that the first event must be a "substantial factor" in producing the succeeding event, and thus, the defendant's conduct is cause in fact of an event only if it was a material element and a substantial factor in bringing it about. *Challis Irrigation Co. v. State,* 107 Idaho 338, 689 P.2d 230 (Ct.App.1984).

### B. *Conclusions of Law of the Court*

9. Exclusive jurisdiction to hear actions brought under the Federal Tort Claims Act is conferred upon the federal district courts. 28 U.S.C. § 1346(b).

■ 10. The imposition of liability in a FTCA case is governed by the laws of the state where the conduct occurred. *Carroll v. United States,* 488 F.Supp. 757, 758 (D.Idaho 1980) (*citing Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Epling v. United States,* 453 F.2d 327, 329 (9th Cir.1971)). The United States may not be found negligent unless it owed an actionable duty to the plaintiff under the laws of the State of Idaho. *Id.* (*citing Kirk v. United States,* 161 F.Supp. 722 (D.Idaho 1958), *aff'd* 270 F.2d 110 (9th Cir.1959)); *see also Art Metal—USA, Inc. v. United States,* 753 F.2d 1151, 1157 (D.C.Cir.1985). The parties have also stipulated that the Forest Service owed Phillips a duty of ordinary care on June 6, 1985, the date of his accident/crash on the road.

■ 11. The elements of common law negligence in Idaho are: (1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage. *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980) (*citing Brizendine v. Nampa Meridian Irrigation Dist.,* 97 Idaho 580, 548 P.2d 80 (1976)).

■ 12. The issue of causation requires consideration of both factual causation and legal causation. *Munson v. State Department of Highways,* 96 Idaho 529, 531, 531 P.2d 1174, 1176 (1975).

■ 13. On July 1, 1981, the Boise National Forest agreed with Producers Lumber Co. of Boise, Idaho, to enter into the Lone Pine Timber Sale Contract (the "contract"). As well as contracting to purchase standing timber, Producers agreed to reconstruct 6.35 miles of road 10384. The reconstruction work covered the portion of the road at milepost 5.

14. The contract triggered the application of a wide range of mandatory Forest Service road building and inspection regulations designed to safeguard drivers who would use the reconstructed road, whether in support of the logging operations or as members of the general motoring public.

15. The contract imposed a duty on Producers Lumber Co. and the Boise National Forest to reconstruct the road according to the drawings prepared by Boise National Forest engineers and specifications selected by Boise National Forest.

16. The contract further obligated the Forest Service to supervise and inspect all phases of the reconstruction work done on the road. The contract also directed the Forest Service to apply standard road construction specifications and to accept the final work only if it met those specifications.

17. Producers Lumber Co. and its contractors were required to follow the Forest Service Standard Specifications for Construction of Roads and Bridges (1979). Part C5.2 of the contract expressly incorporated these standard specifications into the contract. The Preface to the Forest Service Standard Specifications for Construction of Roads and Bridges (1979) alerted both the Forest Service and the contractors to the significance of the specifications: "[T]he specifications in this book are binding on the parties signing the contract and become a part of the contract [when designated in the contract]." Def's Ex. 206. Negligent breach of these specifications, and the Boise National Forest inspectors' negligent failure to detect these breaches directly caused the extreme softness in the road and its partial collapse underneath Phillips' truck near milepost 5 on June 6, 1985.

18. Boise National Forest employees prepared the 1981 Lone Pine Timber Sale Contract and its incorporated road work drawings. These employees selected standard specifications to govern the reconstruction of the road. The contract and drawings designated these standard specifications. The contract required adherence to these specifications by contractors engaged to reconstruct the road. Final responsibility for ensuring adherence remained with the Boise National Forest.

19. Three mandatory Forest Service Standard Specifications regarding compaction, along with other standard specifications, were incorporated by reference into the contract. These specifications required particular levels and methods of compaction of the reconstructed road. These specifications are Sections 212, 304, and 306 of the Forest Service Standard Specifications.

Subsection 306.02 specifically required the contractors to compact the reconstructed roadbed using Compaction Method A. Compaction Method A requires the contractor to compact by operating equipment over the *full width*. This specification made operation of the contractor's equipment over the entire roadbed *mandatory*.

Subsection 304.10 then instructed the contractor to compact the aggregate placed on top of the reconstructed roadbed. This section required the aggregate to be compacted according to Compaction Method B, which specifies compaction to a density of at least 95 percent of the maximum density. The compaction equipment to be used was to meet the requirements of Section 212.02.

Among the specialized compaction equipment the contractors could have used to achieve the compaction density required by Compaction Method B were sheepsfoot, tamping, grid, or steel-wheel rollers. The choice of rollers was thus a matter of contractor and Forest Service discretion. However, the objective to be achieved— compaction of the four-inch course of aggregate to 95 percent of its maximum density per the AASHTO T 99 standard was *not* a matter of choice or judgment. None of these types of specialized compaction equipment were used by any of the contractors, and the Forest Service inspectors and engineers did not object to this breach of the contract.

20. The portion of the road at issue near milepost 5 was extremely soft and a portion of it collapsed because the reconstruction work failed to meet the *mandatory* Forest Service compaction specifications. Employees of the Boise National Forest negligently permitted these mandatory compaction specifications to be breached. In addition, inspectors of the Boise National Forest negligently failed to inspect the reconstruction work and, therefore, negligently failed to detect the unsafe condition of the road near milepost 5.

21. The contract and the Forest Service's road building regulations required the Boise National Forest to inspect the construction project regularly and carefully to ensure that all work complied with the contract and the specifications. Proper inspection of the work by the Boise National Forest was necessary to achieve two important purposes: (1) ensure the safety of drivers who would use the road; and (2) verify satisfactory completion of the work before authorizing payment. The Boise

National Forest designated three employees—Dean Carlson, Donald Jankovsky, and Jack VanHorn, along with their supervisors—during different phases of the reconstruction work, to inspect the contractors' work to ensure compliance with the governing specifications. As noted above, none of these designated inspectors ever performed their required inspection duties. This failure to inspect was a direct cause of Phillips' accident.

22. The Boise National Forest was bound to observe its own contractual and regulatory directives and carelessly did not. Phillips proved in convincing fashion that the Boise National Forest negligently permitted the construction project contractors to breach contractual specifications requiring compaction of the road to stated minimum standards of density and strength. The court will hold the Boise National Forest to the contractual specifications, which it selected for the project. The contract and Forest Service regulations FSM 7700 and FSH 7709.11 all emphasized that no deviation from compliance with the Forest Service Standard Specifications called for in the contract was permitted unless the Forest Service expressly authorized variance in writing.

23. Under the contract, Producers Lumber Company's construction contractors were required to conform all of the reconstruction work to the specifications set forth in the contract. The contract affirmed the right of Boise National Forest to inspect the work at any time and to order substandard work to be corrected. The contract and the standard specifications made clear that no substandard work was to be accepted.

24. Phillips proved through lay and expert testimony that neither J.R. Stewart's crew in 1984, nor Burnett Construction's crew in 1985, properly compacted the road's existing roadbed or its new aggregate surface course. Phillips further showed that the Boise National Forest inspectors could have and should have detected this contract breach, which resulted in an extremely soft area in the road near milepost 5.

25. The Forest Service owed Phillips a general duty of ordinary care, including a duty to maintain the road in a reasonably safe condition. Clearly, the Forest Service was negligent and breached its duty of ordinary care.

26. Thus, the court concludes as a matter of law that the Forest Service owed Phillips a duty of ordinary care to maintain the road in a reasonably safe condition, and a duty to inspect the reconstruction work to ensure that the work did not result in an unsafe condition of the road. Further, these duties were breached, and that these failures of the Forest Service and its agents and employees to conform their conduct to the required standards of care directly caused Phillips' resulting injuries. In addition, Phillips' injuries would not have occurred but for the negligent actions of the Forest Service, and the negligent acts were also a substantial factor in producing the unfortunate and unnecessary accident suffered by Phillips. Finally, the court concludes that Phillips has suffered severe, painful and permanent injuries and losses as a direct result of the negligent actions of the Forest Service and its agents and employees.

27. The plaintiff, Christopher L. Phillips, is entitled to recover damages against Defendant United States.

28. Having carefully considered all of the testimony and evidence produced by both sides at the trial, the court concludes that the plaintiff should recover the following damages [3]:

---

3. The damages are calculated using an expected retirement date of December 2020, and a life expectancy of 74.48 years.

| | |
|---|---|
| LOST WAGES [4] | $ 152,704.00 |
| FUTURE LOST WAGES | 1,134,172.00 |
| LOST FRINGE BENE-FITS [5] | 23,699.00 |
| FUTURE LOST FRINGE BENEFITS | 175,797.00 |
| PAST MEDICAL RELAT-ED EXPENSES | 403,629.00 |
| FUTURE MEDICAL RE-LATED EXPENSES | + 2,877,373.00 |
| TOTAL ECONOMIC LOSSES ............... | $4,767,344.00 |

29. The court has also determined that the plaintiff is entitled to recover damages in the amount of $3,000,000.00 for pain and suffering, mental anguish, and loss of enjoyment of life.

30. In summary, the plaintiff is entitled to judgment against the United States in the following amounts:

| | |
|---|---|
| TOTAL ECONOMIC LOSSES | $4,767,344.00 |
| PAIN AND SUFFERING, MENTAL ANGUISH, AND LOSS OF ENJOYMENT OF LIFE: | + 3,000,000.00 |
| TOTAL RECOVERY ........... | $7,767,344.00 |

---

[4]. This figure represents the total amount of wages lost from the date of the accident, June 6, 1985, to the date of trial, June 1, 1992.

[5]. This figure represents lost fringe benefits from the date of the accident, June 6, 1985, to the date of trial, June 1, 1992.